UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID ALLAN IZETT,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>CROWN ASSET MANAGEMENT, LLC; REBEKAH MOORE A/K/A REBEKAH DENYS TONER; THE RESOLUTION LAW GROUP, APC; PERSOLVE, LLC; and LUIS DUENAS,<br><br>　　　　Defendants. | Case No. 18-cv-05224-EMC<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO COMPEL ARBITRATION**<br><br>Docket No. 44 |

Plaintiff David Allan Izett ("Plaintiff") filed suit against Defendants Crown Asset Management ("Crown"); Rebekah Moore; the Resolution Group, APC; Persolve, LLC; and Luis Duenas (collectively "Defendants"). Docket No. 31. The complaint alleges that Defendants made misrepresentations in attempting to collect a debt owed by Plaintiff, thereby violating the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692–1692p, and the Rosenthal Fair Debt Collections Practices Act ("RFDCPA"), California Civil Code §§ 1788–1788.33. Currently before the Court is Defendants' Motion to Compel Arbitration, Docket No. 44 ("Mot."). For the reasons discussed below, the Court **GRANTS** Defendants' Motion to Compel Arbitration.

### I.　FACTUAL AND PROCEDURAL BACKGROUND

A.　Factual Allegations

The First Amended Class Action Complaint alleges the following. Docket No. 31 ("FAC"). Plaintiff is a senior citizen who Defendants allege incurred debts arising from two consumer credit card accounts issued by Citibank. FAC ¶¶ 9–10. Plaintiff generally denies that any debt is owed. *Id.* ¶ 16. At some point, Citibank transferred the alleged debt to Defendants,

who are in the business of debt collection. *Id.* Crown, Persolve, LLC, and the Resolution Group are companies engaged in the business of purchasing and collecting consumer debts. Rebekah Moore is an employee at Crown, and Luis Duenas is an employee at Persolve. In 2017, Crown sued Plaintiff in the Superior Court of California to collect the alleged debt (the "State Court Action"). *Id.* ¶ 21. The state court entered judgment in favor of Crown and awarded costs and damages totaling $6,654.74. Docket No. 1, Exh. D at 89.

Plaintiff alleges that in the course of attempting to collect the debt, Defendants violated the FDCPA and RFDCPA in various ways, including by misrepresenting "the character, amount, or legal status of the alleged debt," "falsely represent[ing] the role and involvement of legal counsel," and "attempt[ing] to collect interest, fees, or other charges from Plaintiff that are not expressly authorized by the [credit card] agreement." FAC ¶¶ 75–97. Plaintiff specifically alleges that Defendants violated California Code of Civil Procedure § 98 by submitting a Declaration in Lieu of Live Testimony from Rebekah Moore. *Id.* ¶¶ 32, 35, 75; *see* FAC, Exh. 2 ("Moore Decl.").[1] Section 98 allows a party to, "in lieu of presenting direct testimony, offer the prepared testimony of relevant witnesses in the form of affidavits or declarations" so long as the affiant has "a current address . . . that is within 150 miles of the place of trial, and the affiant is available for service of process at that place for a reasonable period of time, during the 20 days immediately prior to trial." Cal. Civ. Proc. Code. § 98. Plaintiff alleges that the Moore Declaration falsely stated that Moore was available for service of process in San Francisco when she in fact lived and worked in the state of Georgia. FAC ¶ 37. Plaintiff also alleges that the Moore Declaration falsely stated that Moore had personal knowledge of the facts stated in the declaration. *Id.* ¶ 35.

According to Plaintiff, Defendants sent declarations like the Moore Declaration to hundreds of California residents in violation of the FDCPA and RFDCPA. *Id.* ¶ 53. Accordingly, Plaintiff asserts his claims on behalf of a putative class, defined as "all persons residing in CA, to whom Defendants sent a Declaration in Lieu of Live Testimony." *Id.* ¶ 52.

---

[1] Defendants relied on the Moore Declaration in the State Court Action to establish that Plaintiff owed a debt balance of $6,654.74 on his Citibank accounts. FAC, Exh. 2. at 38.

B.  Motion to Compel Arbitration

Defendants filed the instant motion to compel arbitration on June 13, 2019. With the motion, Defendants submitted declarations containing what they claim to be exemplars of the credit card agreements governing Plaintiff's two Citibank accounts. Mot. at 12–13; Docket No. 44-1 ("Declaration of William Peck" or "Peck Decl."); Docket No. 44-2 ("Declaration of Jessica Kagansky" or "Kagansky Decl."). The credit card agreements contain arbitration clauses providing that "any dispute may be resolved by binding arbitration." *See* Peck Decl., Exh. 1 at 15, Exh. 4 at 61; Kagansky Decl., Exh. F at 115, Exh. G at 134 (collectively, "Card Agreements" or "Agreements").[2] The Card Agreements expressly allow the arbitration clause to survive "any transfer, sale, or assignment of your account, or any amounts owed on your account, to any other person or entity." Card Agreements at 12. Defendants also submitted a Bill of Sale and Assignment showing that the rights to Plaintiff's accounts were transferred from Citibank to Crown. Peck Decl., Exh. 7 at 112; Kagansky Decl., Exh. A at 7.

C.  The Arbitration Clause

The arbitration clause in the Card Agreements provide in relevant part:

> ***PLEASE READ THIS PROVISION OF THE AGREEMENT CAREFULLY. IT PROVIDES THAT ANY DISPUTE MAY BE RESOLVED BY BINDING ARBITRATION. ARBITRATION REPLACES THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO A JURY AND THE RIGHT TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING. IN ARBITRATION, A DISPUTE IS RESOLVED BY AN ARBITRATOR INSTEAD OF A JUDGE OR JURY. ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN COURT PROCEDURES.***
> *Agreement to Arbitrate:* Either you or we may, without the other's consent, elect mandatory, binding arbitration for any claim, dispute or controversy between you and us (called "Claims").
>
> . . . .
>
> **What Claims are subject to arbitration?** All Claims relating to your account, a prior related account, or our relationship are subject to arbitration, including Claims regarding the application, enforceability, or interpretation of this Agreement and this arbitration provision. All Claims are subject to arbitration, no matter what legal theory they are based on or what remedy (damages, or

---

[2] All four exhibits are identical copies of the Card Agreements.

3

> injunctive or declaratory relief) they seek. This includes Claims based on contract, tort (including intentional tort), fraud, agency, your or our negligence, statutory or regulatory provisions, or any other sources of law . . . Claims and remedies sought as part of a class action, private attorney general or other representative action are subject to arbitration on an individual (non-class, non-representative) basis, and the arbitrator may award relief only on an individual (non-class, non-representative) basis.

Card Agreements at 9.

## II. LEGAL STANDARD

The Federal Arbitration Act ("FAA") applies to any written arbitration agreement that is part of "a contract evidencing a transaction involving commerce." 9 U.S.C. § 2. Both parties agree the FAA applies to the arbitration clause in the Card Agreements here. The FAA reflects "both a 'liberal federal policy favoring arbitration' and the 'fundamental principle that arbitration is a matter of contract.'" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). It allows "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" to bring a petition in district court "for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4.

In adjudicating a petition under 9 U.S.C. § 4, a court's role is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). If the answers to both questions are yes, the court must enforce the arbitration agreement. *Id.* When determining whether the dispute falls within the terms of the agreement, "all doubts are to be resolved in favor of arbitrability." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999).

## III. DISCUSSION

As noted above, the arbitration agreements at issue in this case are contained within the Card Agreements that Citibank alleges it provided to Mr. Izett when he opened his accounts. In order for the Court to rely on those Card Agreements as a basis for compelling arbitration, the Court must first determine whether they are properly authenticated, and if so, whether they are admissible as evidence.

A. Authentication

In order to authenticate a potential piece of evidence, Federal Rule of Evidence 901(a) requires the proponent to "produce evidence sufficient to support a finding that the item is what the proponent claims it is." The authentication requirement may be satisfied by the testimony of a witness with knowledge that an item is what it is claimed to be. Fed. R. Evid. § 901(b)(1). For example, a person who has knowledge of a record system may authenticate a particular record from the system as evidence. *See, e.g.*, *U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*, 576 F.3d 1040, 1044 (9th Cir. 2009) (testimony from a declarant—who was familiar with querying a computer—that the computer search result was accurate is admissible). More specifically, courts have held that when accompanied by a declaration from the appropriate records custodian, "[s]ample credit card agreements or exemplars of what a defendant normally gives to its customers is evidence of the written contract the plaintiff received." *In re Midland Credit Mgmt., Inc. Tel. Consumer Prot. Litig.*, No. 11MD2286-MMA (MDD), 2019 WL 398169, at *4 (S.D. Cal. Jan. 31, 2019). The *Midland* court accepted exemplar Citibank agreements as agreements that governed the parties' contractual relationship because Citibank's custodian of records (Mr. Peck) authenticated the agreements, and plaintiffs provided no evidence that different agreements governed their accounts. *Id.* at *5; *see also Cordas v. Uber Technologies, Inc.*, 228 F. Supp. 3d 985, 988 (N.D. Cal. 2017) (holding that a screenshot demonstrating what the terms and conditions would have looked like when the plaintiff created his Uber account on his iPhone, supported by the testimony of the Uber engineer, was sufficient to authenticate the screenshot as evidence that the terms governed the plaintiff's relationship with Uber).

Here, Defendants rely on declarations from Mr. Peck, the custodian of records for Citibank, to authenticate the Card Agreements. In order for Mr. Peck to do so, he must be a "witness with knowledge . . . that [each Card Agreement] is what it is claimed to be." Fed. R. Evid. § 901(b)(1). Mr. Peck's declarations, establishing his familiarity with Citibank's credit card records, demonstrate that Mr. Peck is a qualified "witness with knowledge." Peck Decl. ¶¶ 2, 4; *see U-Haul*, 576 F.3d at 1044–45 (citing *Thanongsinh v. Bd. of Educ.,* 462 F.3d 762, 777 (7th Cir. 2006), for the proposition that a "qualified witness need only be familiar with the company's

5

recordkeeping practices" (internal quotations omitted)). According to his declarations, Mr. Peck has been employed by Citibank since 2007, his current job title is "Document Control Officer," and he has "personal knowledge of the general business practices of Citibank, its predecessors, and affiliates, with respect to its credit card accounts." *See* Supp. Peck. Decl. ¶ 1–2; Peck Decl. ¶ 1–2. He further notes that he is "a duly authorized custodian of records of Citibank," Peck Decl. ¶ 2, and that he has "access to the business records that relate to the credit card accounts issued by Citibank including, in particular, the records of cardmember accounts and applicable card agreements." Supp. Peck Decl. ¶ 2. Thus, broadly speaking, Mr. Peck is "familiar with the company's recordkeeping practices."

Moreover, Mr. Peck's declarations also make clear that he is familiar with the particular recordkeeping practices that Citibank employs with respect to mailing Card Agreements to customers. He states (1) that Citibank "maintains records relating to credit cards issued by the Bank, including the Accounts, in a computerized database," (2) that the Bank "utilize[s] various quality assurance controls in order to ensure that the address maintained for each cardmember in the database is current and accurate, (3) that the Bank "monitors any mailings that are returned as undeliverable by the postal service and includes a note in the computerized account records for the card member when mailings are returned as undeliverable," (4) that the Bank "employ[s] various quality assurance controls regarding the welcome letters, card agreements, notices and inserts (including change-in-terms notice) intended to be included in the periodic billing statements and other mailings to Citibank cardmembers," and (5) that it has been the Bank's "regular business practice to send a new card agreement to customers at the time they open a new account." Supp. Peck. Decl. at 3. Thus, Mr. Peck is specifically familiar with Citibank's recordkeeping practices as they pertain to sending Card Agreements to customers. Accordingly, the Court finds that Mr. Peck is a suitably knowledgeable witness for the purpose of authenticating the Card Agreements.

Next, the Court turns to whether the Card Agreements have been sufficiently authenticated by Mr. Peck. Plaintiff argues that the Card Agreements have "no connection" to Plaintiff's accounts with Citibank, noting that neither Plaintiff's signature nor his address appears on the Agreements in the record, which are merely exemplars. Opp. at 9. However, Mr. Peck's

6

declarations affirmatively state that the Card Agreements govern Plaintiff's two accounts and that there is no record Plaintiff rejected the agreements by closing his accounts. Mr. Peck asserts that he reviewed Citibank's record and concluded (1) that each exemplar agreement is a "true and correct copy of the card agreement that Citibank mailed to Izett," (2) that "there is no record that the postal service returned the . . . Card Agreement[s] or any other mailings" that were sent to Mr. Izett, and (3) that "there is no record that Izett rejected the . . . Card Agreement[s] by closing" his accounts. Supp. Peck. Decl. ¶¶ 7–11, 15–19. As *Midland* and *Cordas* indicate, such a showing is sufficient to authenticate the Card Agreements as the Agreements governing Plaintiff's accounts. *See Midland*, 2019 WL 398169, at *4; *Cordas*, 228 F. Supp. 3d at 988. In addition, the Card Agreements inform the card holder that "the enclosed Pricing Information Table and Variable Terms Information (together, the "Fact Sheet") are part of this Agreement." Card Agreements at 1. Unlike the Card Agreements, these Fact Sheets contain Plaintiff's name, account numbers, and mailing address. Peck Decl., Exhs. 2, 5. Together, the documents support the inference that the Card Agreements are specific to Plaintiff's accounts. As a result, the Court finds that exemplar Card Agreements are properly authenticated as the Agreements governing Plaintiff's accounts.

B.  Admissibility

Having found the Card Agreements to be properly authenticated, the Court turns to whether the documents are admissible.

1.  Contracts Not Hearsay

The Court first notes that the Card Agreements are likely admissible as documents having "independent legal significance." "Facts of independent legal significance constituting a contract which is at issue are not hearsay." *United States v. Rubier*, 651 F.2d 628, 630 (9th Cir. 1981). In other words, "a written statement, which itself 'affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights,' falls outside the definition of hearsay." *United States v. Bellucci*, 995 F.2d 157, 161 (9th Cir. 1993) (quoting Fed. R. Evid. 801, advisory committee notes); *see also Stuart v. UNUM Life Ins. Co. of Am.*, 217 F.3d 1145, 1154 (9th Cir. 2000) (finding that a document is "excluded from the definition of hearsay and is admissible evidence because it is a legally operative document that defines the rights and liabilities of the

7

parties"). Because the Card Agreements constitute contracts that define the rights and liabilities of the parties to this case, they are precisely the type of document that has "independent legal significance." Consequently, they fall outside the definition of hearsay.

2. <u>Business Record Exception to Hearsay</u>

Furthermore, even if the Card Agreements are not admissible as documents having "independent legal significance," they would likely be admissible through the business records exception to hearsay. According to Federal Rule of Evidence § 803(6) – the business records exception to hearsay – a business record is admissible if:

> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>
> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. § 803(6).

First, as outlined above, Mr. Peck is a "Document Control Officer" of Citibank. Supp. Peck Decl. ¶ 1. In this role, his "responsibilities include the preparation of affidavits or declarations in connection with litigation involving Citibank credit card accounts. [He is] also a duly authorized custodian of records of Citibank and [he has] access to the business records that relate to the credit card accounts issued by Citibank including, in particular, the records of cardmember accounts and applicable card agreements," *id.* ¶ 2. As a result, his testimony may be relied upon to show the conditions required for admitting the Card Agreements through the business record exception.

Second, Mr. Peck's declarations provide sufficient evidence that the issuance of Card Agreements was a "regularly conducted activity" of Citibank and that the mailing of those

Agreements to new customers was "a regular practice" of that activity. He states that the exemplar Agreements were "business records created and maintained by Citibank or its affiliates, in the court of regularly conducted business activity." Supp. Peck Decl. ¶ 3. He also states that it was Citibank's "regular business practice to send a new card agreement to customers at the time they open a new account." Supp. Peck. Decl. ¶ 7. Plaintiff objects that each of these statements "merely parrots the statutory language," and thus is insufficient to prove the Agreements' admissibility. Opp. at 8. Certainly, courts have declined to admit records where declarants offer no more than conclusory statements that repeat the language of Rule 803(6). *See, e.g.*, *Orlob-Radford*, 2016 WL 5859002, at *5 (refusing to accept declarant's "conclusory statements as foundation to establish the Cardholder Agreement as a business record" where declarant "parroted the foundational language of Fed. R. Evid. 803(6), but provided no basis to show how he knew those records were created in the ordinary course of business"); *see also Rogers v. Oregon Trail Elec. Consumers Co-op., Inc.*, No. 3:10-CV-1337-AC, 2012 WL 1635127 at *9 (D. Or. May 8, 2012) (requiring more than "boilerplate, conclusory statements that simply parrot the elements of the business record exception to the hearsay rule").

However, Mr. Peck's declaration offers additional information about Citibank's policies and procedures that elaborates upon their regular business activities and practices. As explained above, Mr. Peck states that Citibank (1) creates and maintains credit card records in a computerized database, (2) utilizes a range of quality control methods to maintain current addresses for cardmembers and to track when mail is returned as undeliverable, and (3) employs "quality assurance controls" regarding the various documents and mailings that are sent to Citibank cardmembers. Supp. Peck. Decl. at 3. In addition, Mr. Peck indicates that new card agreements were sent to customers whenever they opened new accounts, and that Citibank had systems in place for tracking when those documents were returned as undeliverable or rejected by customers through the closure of their account(s). The existence of such structures and policies indicates that Citibank had developed a system in which it was their "regular business practice" to send new card agreements to customers who opened new accounts and to track what—if any— response Citibank received after the documents were sent to customers. Consequently, Mr. Peck's

9

statements about Citibank's regularly conducted business activities and practices go well beyond mere "parroting" of the statutory language and demonstrate that the records at issue were part of Citibank's regularly conducted business activity.

Finally, to be admissible a business record must have been "made at or near the time by— or from information transmitted by—someone with knowledge." Fed. R. Evid.§ 803(6)(a). The business record exception does not require that a party establish *precisely* when a record was made or *specifically* by whom the record was made; instead, it simply requires "that the document be made at or near the time of the act or event it purports to record." *United States v. Ray*, 930 F.2d 1368, 1370 (9th Cir. 1990) (internal quotations omitted), *as amended on denial of reh'g* (Apr. 23, 1991). Furthermore, Rule 803(6) permits that the fulfillment of these requirements may be "shown by the testimony of the custodian or another qualified witness." Fed. R. Evid. § 803(6)(d). Mr. Peck's declaration states that the Bank would "send a new card agreement to customers at the time they open a new account," Supp. Peck. Decl. ¶ 7, and that the exemplars presented to the Court are "true and correct cop[ies] of the card agreement[s] that Citibank mailed to Izett," *id.* Here, Plaintiff's objection to the production of "a generic Card Agreement, unsigned by Plaintiff, with no reference to Plaintiff or Plaintiff's accounts with CITIBANK, N.A.," Opp. at 9, are inapposite. Mr. Peck's declarations as to when the Card Agreements were produced for Mr. Izett are adequate to support the documents' admissibility.

Mr. Izett submitted a declaration[3] in response to the declarations filed by Mr. Peck and Ms.

---

[3] The declaration that Mr. Izett filed was untimely. Mr. Izett was directed to submit any evidence that was responsive to Defendants' post-hearing filings by August 20, 2019. *See* Docket No. 50. Mr. Izett did not submit his declaration until August 21, 2019, *see* Docket No. 54, and Defendants objected, arguing that "[t]he declaration should be stricken as untimely and not considered in connection with the resolution of Defendants' Motion." *See* Objection and Request to Strike Untimely Declaration of David Allan Izett ("Request to Strike"); Docket No. 55.

Civil Local Rule 7-11 provides that a party may file a motion for administrative relief with the Court, while Civil Local Rule 6-1(b) permits a part to appeal to the Court for a continuance when necessary. Civ. L.R. 7-11; 6-1(b). Mr. Izett took neither of those approaches. Accordingly, the Court would be authorized to strike Plaintiff's untimely declaration. *See Leong v. Potter*, 347 F.3d 1117, 1125 (9th Cir. 2003) (approving district court's grant of a "motion to strike [Plaintiff's] request for an adverse inference because it was made in a supplemental brief that was over-length and filed late"); *Young v. Sierra Pac. Power Co.*, No. 3:10-CV-00102-LRH, 2011 WL 4346562, at *2 (D. Nev. Sept. 14, 2011) (striking a supporting declaration filed two days late without explanation). At the same time, Defendants have not suffered prejudice as a result of the untimely

1   Kagansky. *See* Declaration of David Allan Izett ("Izett Decl.") Docket No. 54. In that

2   declaration, Izett asserts that he has "never seen these documents," and "never received the Card

3   Agreement documents and never agreed to be bound by their terms." Izett Decl. at 2. To resolve

4   the stark discrepancy between what the parties' assertions, the Court relies on the mailbox rule.

5   The Ninth Circuit has held that "a sworn statement is credible evidence of mailing for purposes of

6   the mailbox rule." *Schikore v. BankAmerica Supplemental Ret. Plan*, 269 F.3d 956, 964 (9th Cir.

7   2001). Because Mr. Peck declared "The 137 Card Agreement was mailed to the address Citibank

8   had on file for the 137 Account," Supp. Peck Decl. at 4, the Court considers Mr. Peck's

9   declaration as credible evidence of a mailing. Courts have noted that "[t]his presumption . . . may

10  be rebutted by 'showing that the document never arrived.'" *Schonbak v. Minnesota Life*, No. 16-

11  CV-0295 DMS (JMA), 2018 WL 6257185, at *2 (S.D. Cal. May 7, 2018) (citing *Huizar v. Carey*,

12  273 F.3d 1220, 1223 n.3 (9th Cir. 2001)). But rebuttal evidence must rise beyond the level of a

13  mere denial of receipt; this is because "the mailbox rule applies 'precisely to avoid the type of

14  swearing contest in which the parties are presently involved.'" *Id.* (quoting *Schikore*, 269 F.3d at

15  962); *compare Henggeler v. Brumbaugh & Quandahl, P.C., LLO*, 894 F. Supp. 2d 1180, 1187 (D.

16  Neb. 2012) (concluding that—where Plaintiff did not live at the address Defendant bank had on

17  file—no "valid agreement to arbitrate exists" because Defendant "submitted only a generic

18  cardmember agreement from [Defendant] Bank . . . and [Defendant] has failed to provide evidence

19  that [Plaintiff] was a party to the agreement.").[4] Mr. Izett does not deny that 2600 Bean Creek Rd,

20  Scotts Valley, CA 95066-3105 (the address to which the Card Agreements and other documents

21  were sent) was his correct address; nor did he deny receiving other mail from Citibank at that

---

filing, so the Court declines to strike Plaintiff's declaration. *See Talada v. City of Martinez*, 656 F. Supp. 2d 1147, 1151 n.1 (N.D. Cal. 2009) (denying motion to strike when prejudice is fully mitigated).

[4] Some cases have held that "a party's 'specific factual denial of receipt' is sufficient to rebut any presumption of receipt under the common law mailbox rule." *McCarnes v. Dexter*, 549 F. Supp. 2d 1204, 1206 (C.D. Cal. 2008). However, this holding has generally been limited to notice in the context of FRAP 4(a)(6). *See Schikore*, 269 F.3d at 964 ("Allowing a rebuttal of the presumption of receipt by a 'specific factual denial' was . . . consistent with the general purpose of Federal Rule of Appellate Procedure 4(a)(6), which is to ensure that parties who have not received notice of the entry of judgment are not thereby deprived of the opportunity to appeal.")

11

address. As a result, the Court finds that Mr. Izett has failed to rebut the presumption that Citibank mailed him the Card Agreements.

In addition, the Court observes that other courts have also found similar exemplar card agreements to be admissible as exceptions to the rule against hearsay. *See, e.g.*, *Mounts v. Midland Funding LLC*, 257 F. Supp. 3d 930, 938 (E.D. Tenn. 2017) ("the Court may properly consider the [credit card agreements] defendants submitted to support the existence of the arbitration agreements under the business records exception to the rule against hearsay"); *Stratton v. Portfolio Recovery Assocs., LLC*, 706 F. App'x 840, 844 (6th Cir. 2017) (finding that "a ten page credit card contract that does not contain [Plaintiff's] name, but does contain a branch designation number . . . matching at least one of the other documents in [Plaintiff's] account-records" was admissible through the business records exception); *Orlob-Radford v. Midland Funding LLC*, No. 2:15-CV-00307-JLQ, 2016 WL 5859002, at *5 (E.D. Wash. Oct. 5, 2016) ("the Cardholder Agreement may be admissible as a business record of the Defendants through the testimony of . . . [a witness] responsible for maintaining and overseeing media" (internal quotations omitted).

For the forgoing reasons, the Court finds that the Card Agreements were properly authenticated by Mr. Peck and are admissible as contracts (falling outside the definition of hearsay), or alternatively through business records exception to hearsay.

C.      Transfer of the Arbitration Rights to Crown

Plaintiff also cursorily suggests that the Agreements are not valid because (1) they may have been "superseded or replaced by another agreement," or (2) Crown may have signed a waiver of arbitration in its Purchase and Sale Agreement (PSA) with Citibank. That is, Plaintiff asserts that the arbitration rights Citibank had under the Agreements may not have been fully transferred to Crown. Opp. at 12. As to Plaintiff's first argument, Defendants correctly note that Plaintiff nowhere alleges that the Agreements were in fact superseded by another agreement governing his accounts. Reply at 2. In response to Plaintiff's second argument, Defendants submitted a full

PSA with all provisions relevant to arbitration unredacted for the Court to review.[5] Supplemental Kagansky Declaration ("Supp. Kagansky Decl."), Exh. 1; Docket No. 52. These provisions reveal that the only limitation on Crown's right to compel arbitration was that it needed to obtain Citibank's approval before asserting the right. Defendants represent that they have Citibank's approval to compel arbitration in this case. Reply at 8–9. Ms. Kagansky's declaration states that "Crown received Citibank's written approval to move to compel arbitration of the claims Izett asserts in this action." Supp. Kagansky Decl. ¶ 7. In addition, Citibank has filed multiple declarations in support of Defendants' Motion to Compel Arbitration. *See, e.g.*, Peck Decl., Supp. Peck Decl. Plus, the Card Agreements expressly allow the arbitration clause to survive "any transfer, sale, or assignment of your account, or any amounts owed on your account, to any other person or entity." Card Agreements at 12. Defendants have also submitted a Bill of Sale and Assignment showing that the rights to Plaintiff's accounts were transferred from Citibank to Crown. Peck Decl., Exh. 7 at 112; Kagansky Decl., Exh. A at 7. Thus, there is no evidence that the Card Agreements have been superseded or replaced by another agreement; nor is their evidence that Crown signed a waiver of arbitration in its PSA with Citibank. To the contrary, the evidence suggests that Crown has the right to compel arbitration based on the Card Agreements. Specifically, Ms. Kagansky states in her declaration: "Crown received Citibank's written approval to move to compel arbitration of the claims Izett asserts in this action and the Bank provided declaration in support of the motion." Supp. Kagansky Decl. ¶ 7 (see Docket No. 51 "Declaration of William Peck in Support of Defendant's Motion to Compel Arbitration").

D. <u>The Merger and Waiver Issues</u>

Having found the Card Agreements authenticated, admissible, and not waived by Defendants, the Court next turns to the issues of merger and waiver. Plaintiff argues that, even if the Court accepts the exemplar Card Agreements, the Agreements are not enforceable because: (1) Defendants' right to compel arbitration merged with the judgment in the State Court Action, and

---

[5] Defendants originally submitted a partially redacted copy of the PSA with their reply brief. Docket No. 48–2. At the motion hearing, Plaintiffs voiced concerns that the redactions may have concealed limitations as to the transfer of arbitration rights. As ordered by the Court, Defendants re-submitted the PSA with all provisions relevant to arbitration unredacted.

13

(2) Defendants waived their right to compel arbitration in this case by initiating litigation in the State Court Action. Before reaching the merits of these arguments, the Court must first resolve two threshold issues: whether the arguments are properly directed to this Court or to the arbitrator, and, if the former, what law this Court should apply.

### 1. Delegation of the Merger and Waiver Issues

Defendants argue that the Court need not decide the merger and waiver issues raised by Plaintiff because such questions were "clearly and unmistakably delegate[d]" to the arbitrator. Mot. at 23–24. The Supreme Court has explained that "[c]hallenges to the validity of arbitration agreements . . . can be divided into two types. One type challenges specifically the validity of the agreement to arbitrate." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006) (citing *Southland Corp. v. Keating*, 465 U.S. 1, 4–5 (1984)). "The other challenges the contract as a whole, either on a ground that directly affects the entire agreement . . . , or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid." *Id.* The first type of challenge is generally for courts to resolve. *Id.* at 445. The second is for the arbitrator to decide. *Id.* at 445–46.

Plaintiff's merger argument implicates the entire Card Agreements because he insists that "*any* contractual rights [under the Agreements] have now merged into the Judgment obtained by Defendant . . . in the state court action, and thus been extinguished." Opp. at 3 (emphasis added). Accordingly, it is for the arbitrator to determine whether Plaintiff's merger argument has merit. *See Buckeye Check Cashing*, 546 U.S. at 445–46.

In contrast, Plaintiff's waiver argument pertains specifically to the arbitration clause; he posits that by choosing to litigate the debt collection action in state court, Defendants waived the right to arbitrate this action. Opp. at 13. That argument is thus "for judicial determination [u]nless the parties clearly and unmistakably provide otherwise." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (citation omitted); *see Martin v. Yasuda*, 829 F.3d 1118, 1123 (9th Cir. 2016) (observing that "[e]very circuit that has addressed this issue—whether a district court or an arbitrator should decide if a party waived its right to arbitrate through litigation conducted before the district court—has reached the same conclusion" that it "is presumptively for

14

a court and not an arbitrator to decide").

The Card Agreements here contain a delegation clause:

> **What Claims are subject to arbitration?** All Claims relating to your account, a prior related account, or our relationship are subject to arbitration, including Claims regarding the application, enforceability, or interpretation of this Agreement and this arbitration provision.

Card Agreements at 9. The Ninth Circuit has repeatedly found that substantially similar delegation clauses do not "clearly and unmistakably" delegate the issue of waiver by litigation conduct to the arbitrator. For example, in *Cox v. Ocean View Hotel Corp.*, the delegation clause stated in pertinent part:

> "Any controversy except for Workmen's Compensation, involving the construction or application of the terms, provisions, or conditions of this Agreement or otherwise arising out of or related to this Agreement shall likewise be settled by arbitration."

533 F.3d 1114, 1117 (9th Cir. 2008). The court "nevertheless found that the court and not the arbitrator should decide the issue of waiver by litigation conduct." *Martin*, 829 F.3d at 1124 (citing *Cox*, 533 F.3d at 1117). More recently, the Ninth Circuit in *Martin* concluded that a delegation clause that stated, "[a]ll determinations as to the scope, enforceability and effect of this arbitration agreement shall be decided by the arbitrator, and not by a court," was "*a fortiori* insufficient to show an intent that an arbitrator decide the waiver by litigation conduct issue and to overcome the presumption to the contrary." *Id.* at 1124. In accordance with *Cox* and *Martin*, the delegation clause in this case does not preclude the Court from deciding the question of waiver by litigation. *See also Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1209 n.4 (9th Cir. 2016) (explaining that "[t]he arbitration agreements may not have clearly and unmistakably delegated to the arbitrator the authority to decide the question of waiver by litigation conduct" despite delegating the authority to "to decide issues relating to the 'enforceability, revocability or validity of the Arbitration Provision'") (citing *Martin*, 829 F.3d at 1124–25).

Accordingly, an arbitrator must decide the issue of merger, and this Court must decide the issue of waiver.

### 2. Choice of Law

An arbitration agreement governed by the FAA is valid unless grounds "exist at law or in equity for the revocation any contract." 9 U.S.C. § 2. There is a "strong policy favoring enforcement of arbitration agreements," but "generally applicable contract defenses such as fraud, duress, or unconscionability are applicable to arbitration agreements as they are to other contracts." *Loewen v. Lyft, Inc.*, 129 F. Supp. 3d 945, 951 (N.D. Cal. 2015) (citing *Concepcion*, 563 U.S. at 339); *see* 9 U.S.C. § 2. In determining the validity of an agreement to arbitrate, federal courts "should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Defendants assert that South Dakota law governs here under the choice-of-law provision in the Card Agreements. Mot. at 17.

Federal law applies to the choice-of-law rule determination because jurisdiction in this case is based on a federal question. *See In re Sterba*, 852 F.3d 1175, 1179 (9th Cir. 2017). Federal common law adheres to the Restatement (Second) of Conflict of Laws, which instructs that courts should honor the parties' choice-of-law to govern their claims in dispute, unless (1) "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice" or (2) honoring the parties' choice "would be contrary to a fundamental policy of a state which has a materially greater interest" in the dispute. *Restatement (Second) of Conflicts of Law* § 187(2) (1988).

The choice-of-law provision in the Card Agreements provides: "Federal law and the law of South Dakota, where we [Citibank] are located, govern the terms and enforcement of this Agreement." Card Agreements at 13 (137 Account), 12 (990 Account). Courts have found that a chosen state bears a substantial relationship to the parties when credit on accounts extended from that state. *See, e.g.*, *Midland*, 2019 WL 398169, at *4. The court in *Midland* found that an identical choice-of-law provision was enforceable because the credit on the accounts in question extended from South Dakota and the application of South Dakota law would not be contrary to any fundamental policy of California. *Id.* The Citibank accounts at issue in this case extended from South Dakota, and Plaintiff does not contest that the application of South Dakota law is contrary to California policy. *See* Opp. at 5. Accordingly, South Dakota law governs the

16

enforceability of the agreement.

3. <u>Merger</u>

As noted above, Plaintiff's contention that Defendants' right to arbitrate was extinguished by the judgment in the State Court Action must be directed to the arbitrator.

4. <u>Waiver</u>

Plaintiff argues that Defendants waived any right to arbitrate the FDCPA and RDCPA claims by suing Plaintiffs in the State Court Action instead of arbitrating the claim. Opp. at 13 (citing *Lewallen v. Green Tree Servicing, LLC*, 487 F.3d 1085, 1091 (8th Cir. 2007) ("a party must do all it could reasonably have been expected to do to make the earliest feasible determination of whether to proceed judicially or by arbitration")). Plaintiff is incorrect.

It is true that an arbitration agreement may be waived. *Tjeerdsma v. Global Steel Buildings, Inc.*, 466 N.W.2d 643, 645 (S.D. 1991). Since there is a dominant policy favoring arbitration, however, waiver cannot be lightly inferred. *Id.* A party seeking to prove waiver of a right to arbitrate must demonstrate: (1) knowledge of an existing right to compel arbitration; (2) acts inconsistent with that existing right; and (3) prejudice to the party opposing arbitration resulting from such inconsistent rights. *Lewallen*, 487 F.3d at 1090. The overarching principle of waiver is to protect the party opposing arbitration from prejudice. *See Lewallen*, 487 F.3d at 1093 ("Even where a party has acted inconsistently with its right to arbitrate, it has not waived that right unless its actions prejudice the other party."). A party acts inconsistently with its right to arbitrate if the party "[s]ubstantially invoke[s] the litigation machinery before asserting its arbitration right." *Ritzel Commc'ns, Inc. v. Mid-Am. Cellular Tel. Co.*, 989 F.2d 966, 969 (8th Cir. 1993) (quoting *E.C. Ernst, Inc. v. Manhattan Constr. Co. of Tex.*, 559 F.2d 268, 269 (5th Cir. 1997)). A party "substantially invokes the litigation machinery" when, for example, it files a lawsuit on arbitrable claims and then engages in extensive discovery or fails to move to compel arbitration and stay litigation in a timely manner. *Stifel, Nicolaus & Co. Inc. v. Freeman*, 924 F.2d 157, 158 (8th Cir. 1991). In *Lewallen*, the Eighth Circuit found that Defendants had acted inconsistently with their right to arbitrate by serving "extensive" discovery requests, filing "substantive motions in the case," and participating in hearings on its proof of claim before seeking arbitration.

17

*Lewallen*, 487 F.3d at 1090. Typically, the inconsistent conduct pertains to conduct within the suit at issue.

Here, the claim litigated by Defendants in the State Court Action for recovery of debt involved a *separate* lawsuit and is distinct from this suit brought by Plaintiff under the FDCPA and RFDCPA. Where, as here, a party has brought one suit on certain claims and subsequently seeks to arbitrate other claims in a separate lawsuit, courts have consistently found no waiver exists. *See Davis v. CACH, LLC*, No. 14-CV-03892-BLF, 2015 WL 913392, at *7 (N.D. Cal. Mar. 2, 2015) ("The mere filing of a lawsuit in state court to collect on a debt does not mean that the debt collector cannot then compel arbitration if the debtor later brings suit regarding different claims."); *James v. Portfolio Recovery Assocs., LLC*, No. 14-CV-03889-RMW, 2015 WL 720195, at *5 (N.D. Cal. Feb. 20, 2015) ("[b]ringing a lawsuit for debt collection may result in defendants' waiver of arbitration for that case, but it does not bar plaintiffs from compelling arbitration in that action or . . . in all future separate causes of action [] against them"); *Schwartz v. CACH, LLC*, No. CIV.A. 13-12644-FDS, 2014 WL 298107, at *3 (D. Mass. Jan. 27, 2014) ("decision not to invoke arbitration in the earlier state-court collection actions is not relevant [to decision to compel arbitration in present suit for breach of contract]"). Plaintiffs erroneously analogize *Lewallen* and other cases in which parties had acted inconsistently with their right to arbitrate through their litigation conduct *in the same case*. *See, e.g.*, *Lewallen*, 487 F.3d at 1090.

Further, Defendants' decision to litigate in the State Court Action has not prejudiced Plaintiff in *this* case. *See Lewallen*, 487 F.3d at 1093 (emphasizing that waiver does not occur unless the party's actions prejudiced the other party). For example, Plaintiff has not been forced to unnecessarily expend time and expense in this litigation by Defendants' conduct in the State Court Action; Defendants have moved to compel arbitration expeditiously herein. *See Ritzel*, 989 F.2d at 969 (explaining that delay and the extent of the moving party's trial-oriented activity are material factors in assessing a claim of prejudice); *Fraser v. Merrill Lynch Pierce, Fenner & Smith, Inc.*, 817 F.2d 250, 252 (4th Cir.1987) ("Where a party fails to demand arbitration during pretrial proceedings, and, in the meantime, engages in pretrial activity inconsistent with an intent to arbitrate, the party later opposing a motion to compel arbitration may more easily show that its

18

position has been compromised, *i.e.*, prejudiced."). Regardless of whether the first dispute was arbitrated or litigated, Plaintiffs' claim in this case would still obtain.

In sum, Defendants have not waived their right to arbitrate this action.

### IV. <u>CONCLUSION</u>

For the reasons stated herein, the Court finds that the Card Agreements were properly authenticated and are admissible, and that Defendants have not waived the arbitration rights contained in those agreements. The question whether Defendants' right to arbitrate was extinguished by the judgment in the State Court Action must be directed to the arbitrator, as must Plaintiff's other claims. Accordingly, the Court **GRANTS** Defendants' Motion to Compel Arbitration.

This order disposes of Docket No. 44.

**IT IS SO ORDERED**.

Dated: October 1, 2019

_____
EDWARD M. CHEN
United States District Judge